**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF FLORIDA**

CASE NO.: 05-21169-CIV-MOORE/GARBER

MARCELA CORDOVA, GEORGE FLORES,
HENRY IURMAN, MARCOS MUSTIELES,
and KATIA OCAMPO, individually and on
behalf of all others similarly situated,

        Plaintiffs,

vs.

LEHMAN BROTHERS, INC., a New York
Corporation; MERRILL LYNCH & CO., INC.,
a Delaware Corporation; RAYMOND JAMES
FINANCIAL SERVICES, INC., a Florida
Corporation; OLIVA INVESTMENT GROUP,
INC., a Florida Corporation; SUNTRUST
BANKS, INC., a Georgia corporation, HSBC
Bank, U.S.A., LUIS CORNIDE, and ROBERT A.
DE LA RIVA,

        Defendants.

_____/

**CLOSED
CIVIL
CASE**

## ORDER GRANTING DEFENDANTS' MOTIONS TO DISMISS

THIS CAUSE came before the Court upon Defendant Raymond James Financial Services,

Inc.'s Motion to Dismiss (dkt # 217), Defendant SunTrust Bank, Inc.'s Motion to Dismiss (dkt #

218), Defendant Merrill Lynch & Co., Inc.'s Motion to Dismiss (dkt # 220), Defendant Lehman

Brothers, Inc.'s Motion to Dismiss (dkt # 221), and Defendant Oliva Investment Group, Inc.'s

Motion to Dismiss (dkt # 226). On October 30, 2007, the Court held a hearing (dkt # 355) to

discuss the issues raised in these Motions to Dismiss.

UPON CONSIDERATION of the Motions, the hearing, the record, and being otherwise

fully advised in the premises, the Court enters the following Order.

I.    **BACKGROUND**

The plaintiffs in this case are Marcela Cordova, Jorge Flores, Henry Iurman, Marcos Mustieles and Katia Ocampo, individually and on behalf of all others similarly situated (collectively "Plaintiffs"). 2nd Amend. Compl. ¶¶ 3–7. The defendants are Lehman Brothers, Inc. ("Lehman Bros."); Merrill Lynch & Co., Inc. ("Merrill Lynch"); Raymond James Financial Services, Inc. ("Raymond James"); Oliva Investment Group, Inc. ("OIG"); and SunTrust Banks, Inc. ("SunTrust") (collectively "Defendants"). Id. at ¶¶ 8–12.

On March 28, 2005, the Securities and Exchange Commission ("SEC") commenced an action in this Court against Pension Fund of America, L.C., its affiliated entities, and principals (collectively "PFA") (Case No. 05-20863-CIV-MOORE) for violations of federal securities law. On April 28, 2005, the instant action was commenced alleging state law claims of fraud against financial institutions that did business with or were otherwise associated with PFA. Plaintiffs filed their First Amended Complaint on June 22, 2005 (dkt # 38). On January 17, 2006, this Court entered an Order (dkt # 168) holding that the Securities Litigation Uniform Standards Act ("SLUSA") preempts state-law-based claims in the First Amended Complaint. The Court dismissed Plaintiffs' First Amended Complaint and granted leave to file a second amended complaint pleading federal securities law claims. On February 13, 2006, Plaintiffs filed their Second Amended Complaint (dkt # 189) alleging that Defendants violated §12(1) and §15 of the Securities Act of 1933 (Count I) and violated §10(b) of the Securities and Exchange Act of 1934 and SEC Rule 10b-5 (Count II), in connection with the fraudulent scheme perpetrated by PFA in defrauding thousands of PFA's investors out of over $127 million. 2nd Amend. Compl. ¶ 1.

Plaintiffs allege that PFA sold retirement trusts to investors throughout the world,

2

principally in Latin America. PFA marketed itself by touting the safety of investing through them with Defendants as trustees. PFA offered two retirement trust plans: the Liberty Trust, a monthly or annual contribution plan and the Capital Trust, a one-time contribution plan. Id. at ¶ 22. Approximately 85 percent of all investors chose the Liberty Trust. Id. The Liberty Trust required annual contributions of between $1,000 and $20,000 for ten to fifteen years and imposed significant early withdrawal penalties. Id. The Capital Trust was a ten-year plan that required a minimum one-time contribution of $10,000. Id. The investment component of both plans provided investors with a choice of eight mutual funds offered by well known U.S. mutual fund companies. PFA combined the mutual funds with a term life insurance component, provided through PFA Assurance, which purported to give investors a secure return on their investments. Id.

PFA affiliated itself with Defendants and touted its relationship with these well known financial institutions, allegedly telling investors that Defendants would ensure the safe handling of investors' funds. Plaintiffs allege that the principal attraction of PFA's retirement trusts was the promise that major U.S. financial institutions would be the custodians and/or trustees of investors' funds. Id. at ¶ 23. Plaintiffs allege that the money invested through PFA was diverted and dissipated through a massive fraud perpetrated by PFA with the knowledge and assistance of Defendants. Plaintiffs allege that Defendants failed to segregate each individual retirement trust and improperly pooled investor funds. PFA improperly diverted millions of dollars of investor funds to non-investment purposes, and Plaintiffs allege that Defendants failed to disclose to investors that PFA was siphoning as much as 90 percent of investor funds for non-investment purposes. Id. at ¶ 37. Plaintiffs allege that PFA charged excessive front-load fees on the mutual

fund component of the retirement trusts and failed to disclose to investors the amount of fees charged. Id. at ¶ 38. PFA charged some investors average fees and costs of 80 percent on first-year contributions, placing only a small fraction of investor funds, post-investment, in designated mutual funds. Id. In other cases, PFA did not place any of investors' contributions into their designated mutual funds and used all of investors' funds to pay commissions and other fees and costs. Id.

Plaintiffs further allege that PFA and SunTrust sent investors fraudulent account statements which misrepresented the status and balance of investors' retirement trusts. Id. at ¶ 39. The statements failed to disclose the actual amount placed by PFA, post-investment, in the mutual funds designated by investors. Id. By not disclosing the deducted commissions, fees and costs in the statements, the post-investment annual statements overstated the actual amount of investor holdings. Id.

## II.    STANDARD

A motion to dismiss for failure to state a claim merely tests the sufficiency of the complaint; it does not decide the merits of the case. Milburn v. United States, 734 F.2d 762, 765 (11th Cir. 1984). On a motion to dismiss, the Court must construe the complaint in the light most favorable to the plaintiff and accept the factual allegations as true. SEC v. ESM Group, Inc., 835 F.2d 270, 272 (11th Cir. 1988). "[A] complaint should not be dismissed merely because a plaintiff's allegations do not support the particular legal theory he advances, for the court is under a duty to examine the complaint to determine if the allegations provide for relief on any possible theory." Bowers v. Hardwick, 478 U.S. 186, 201-02 (1986) (Blackmun, J., dissenting) (quotations omitted); see Brooks v. Blue Cross & Blue Shield of Fla., Inc., 116 F.3d 1364, 1369

4

(11th Cir. 1997).  Nonetheless, to withstand a motion to dismiss, a complaint must allege facts sufficient "to raise a right to relief above the speculative level[.]"  Bell Atlantic Corp. v. Twombly, 127 S. Ct. 1955, 1964–65 (2007).  Further, "a plaintiff's obligation to provide the grounds of his entitlement to relief requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do."  Twombly, 127 S. Ct. at 1964–65 (citations and quotes omitted).

## III.   ANALYSIS

### A.   Securities and Exchange Act §10(b) and Rule 10b-5

Section 10(b) of the Securities and Exchange Act of 1934 forbids the "use or employ, in connection with the purchase or sale of any security . . . , [of] any manipulative or deceptive device or contrivance in contravention of such rules and regulations as the [SEC] may prescribe as necessary or appropriate in the public interest or for the protection of investors."  15 U.S.C. §78j(b).  SEC Rule 10b-5 implements §10(b) by declaring it unlawful:

(a) To employ any device, scheme, or artifice to defraud,

(b) To make any untrue statement of a material fact or to omit to state a material

fact necessary in order to make the statements made, in the light of the

circumstances under which they were made, not misleading, or

(c) To engage in any act, practice, or course of business which operates or would

operate as a fraud or deceit upon any person, in connection with the purchase or

sale of any security.

17 CFR §240.10b-5; Tellabs, Inc. v. Makor Issues & Right, Ltd., 127 S. Ct. 2499, 2507 (2007). Section 10(b) affords a right of action to purchasers or sellers of securities injured by its

violation. <u>Tellabs</u>, 127 S. Ct. at 2507 (citations omitted).

To state a claim "under §10(b) and Rule 10b-5, a plaintiff must show the following: '(1) a misstatement or omission, (2) of a material fact, (3) made with scienter, (4) on which plaintiff relied, (5) that proximately caused his injury.'" <u>Ziemba v. Cascade Intern, Inc.</u>, 256 F.3d 1194, 1202 (11th Cir. 2001) (citing <u>Bryant v. Avado Brands, Inc.</u>, 187 F.3d 1271, 1281 (11th Cir. 1999)).

### 1. Aiding and Abetting

A §10(b) private right of action exists only for primary conduct violating securities laws; the private right of action does not extend to parties who are alleged merely to have aided or abetted a manipulative or deceptive act. <u>Central Bank v. First Interstate Bank</u>, 511 U.S. 164, 191 (1994) (eliminating aiding and abetting liability in private causes of action). Prior to the Supreme Court eliminating private causes of action for aiding and abetting securities fraud in <u>Central Bank</u>, the Eleventh Circuit required plaintiffs bringing private causes of action for aiding and abetting securities fraud to show that the defendant (1) had "general awareness that his role was part of an overall activity that [was] improper," and (2) "knowingly and substantially assisted the violation." <u>Rudolph v. Arthur Andersen & Co.</u>, 800 F.2d 1040 (11th Cir. 1986). Therefore, to show primary liability under §10(b), a plaintiff must be able to show a defendant had more than "general awareness that his role was part of an overall activity that [was] improper" and did more than "substantially assist" a violation. Allegations of "substantial assistance in [an] alleged fraud" or playing a "significant role in drafting, creating, reviewing, or editing allegedly fraudulent [marketing materials]" without a statement being clearly attributable to a defendant are "the kinds of [aiding and abetting] allegations that were rejected in <u>Central Bank</u>." <u>Ziemba</u>, 256

F.3d at 1205.

Plaintiffs' allegations show that it was primarily PFA that perpetrated, masterminded, and benefitted from the fraud alleged in this action; it appears that many of Plaintiffs' allegations are merely that Defendants facilitated PFA's misconduct. Pl. Resp. at 14 (Plaintiffs indicate that "Defendants are alleged to have committed fraud primarily by omission." Many of the alleged omissions appear to be primarily failures to disclose information about PFA's fraudulent activities). Plaintiffs introduce the underlying fraud with a section entitled "*PFA's* Business Scheme." 2nd Amend. Compl. at 6 (emphasis added). Plaintiffs described how PFA contrived, from the very beginning, "to boost sales" by using the reputation of "large multi-national banks with strong recognition in Latin America" to gain customers. Id. at ¶ 23.

Plaintiffs discuss the underlying fraud in a section entitled "*PFA's* Fraud." Id. at 11 (emphasis added). Plaintiffs state that the "massive fraud was perpetrated *by PFA*, with the *knowledge and participation* of the Financial Institution Defendants." Id. at ¶ 34 (emphasis added). Plaintiffs allege that Defendants aided or facilitated PFA's fraud by "*allow[ing]* PFA to exert complete control over the investor funds entrusted to each Financial Institution Defendant." Id. at ¶ 36 (emphasis added); see also ¶¶ 37, 44, 60, 96, 114. Plaintiffs allege that PFA and its insiders, not Defendants, "were siphoning as much as 90 percent, and sometimes 100 percent, of investor funds for non-investment purposes," and that "PFA's principals, Cornide and de la Riva, used investors' funds to pay themselves exorbitant salaries and bonuses, and buy millions of dollars of real estate in Coral Gables and the Florida Keys." Id. at ¶ 37. Plaintiffs do not allege that Defendants, or their employees, misappropriated or used any of Plaintiffs' money for personal reasons or made any withdrawals or transfers other than those directed by PFA, the

7

account holder.

Because aiding and abetting liability has been eliminated in private causes of action, a defendant cannot be held liable in a private action, merely for knowing another party was committing fraudulent acts and allowing that party to commit those acts, nor can a defendant be held liable for merely "assisting" or even "substantially assisting" another person's fraud; rather, the defendant must itself commit actionable fraud. *See* Ziemba, 256 F.3d at 1203–06. Plaintiffs allege in multiple paragraphs of the Second Amended Complaint that Defendants "allowed" or "permitted" PFA to commit fraudulent acts; allowed PFA to "utilize" or "use" marketing materials or Defendants' names and logos; that Defendants "were aware," "knew," or had "knowledge" of PFA's fraudulent activities; and that Defendants "assisted" or "facilitated" PFA's fraudulent activities. 2nd Amend. Compl. ¶¶ 24, 34, 36, 38, 39, 42, 46, 47, 57–59, 60, 62, 64, 80, 81, 82, 83, 84, 87, 96, 97, 103, 104, 115, 117, 119, 121, 124, 127. However, these allegations are not enough, without more, to show primarily liablity for a violation of §10(b) and Rule 10b-5.

Plaintiffs attempt to hold each Defendant responsible for all of PFA's representations and omissions in PFA's marketing materials or contracts. Plaintiffs appear to argue that, as long as one company's name is listed on another company's solicitation materials, then the first company has vouched for all of the business practices of the other company and is thereby responsible for any misconduct or fraud committed by that other company and its directors. Adopting such a rule would too broadly expand liability and would require the Court to find misstatements by implication, rather than to analyze the specific wording of statements actually made, as required by the particularity requirement of Rule 9(b).

Plaintiffs identify Luis Cornide and Robert de la Riva, the principals (President and Vice

8

President) of PFA, as the parties who "drafted, wrote, reviewed, revised and/or caused to be published the promotional and offering materials that PFA and its sales agents presented to Plaintiffs, including but not limited to informational brochures, sales agent information, and the application form ('PFA investment contract') which PFA used to solicit Plaintiffs' investment." 2nd Amend. Compl. ¶¶ 14, 15. For the most part, the materials mentioned in the Complaint are PFA's marketing materials, which PFA was responsible for creating, and the representations in the materials were publically attributable to PFA.[1] Yet, Plaintiffs attempt to hold Defendants liable as primary actors for misrepresentations contained in those materials alleging that Defendants "co-sponsored," "reviewed," "offered input," "edited," and/or "approved" the materials. Id. at ¶¶ 24, 31, 41, 49, 54, 55, 78, 84, 125. However, as cited above, the Eleventh Circuit in Ziemba held that allegations of a "significant role in drafting, creating, reviewing, or editing allegedly fraudulent [marketing materials]" without a statement being clearly attributable to a defendant are "the kinds of [aiding and abetting] allegations that were rejected in Central Bank." Ziemba, 256 F.3d at 1205. Consequently, the Court will focus further discussion on statements clearly made by and attributable to Defendants, not those made by PFA.

### 2. Particularity Requirement

To survive a motion to dismiss, a plaintiff's claims of fraud under §10(b) and Rule 10b-5 must satisfy the requirements of Fed. R. Civ. P. 9(b), which requires that "the circumstances constituting fraud or mistake shall be stated with particularity." Ziemba, 256 F.3d at 1202. "The

---

[1]Interestingly, as SunTrust points out, Cornide's deposition testimony—portions of which Plaintiffs quote in their Responses—indicates that the contribution SunTrust made to the marketing materials was to provide information about SunTrust Bank. SunTrust Reply at 7, n.8 (Question: "Other than the information about SunTrust, who created the rest of the language in the marketing materials for Pension Fund of America in 1999?" Answer: "We did. Robert [de la Riva] and myself.")

particularity rule serves an important purpose in fraud actions by alerting defendants to the 'precise misconduct with which they are charged' and protecting defendants 'against spurious charges of immoral and fraudulent behavior.'" Ziemba, 256 F.3d at 1202 (citing Durham v. Bus. Management Assocs., 847 F.2d 1505, 1511 (11th Cir. 1988)). "The application of Rule 9(b) . . . 'must not abrogate the concept of notice pleading.'" Id. Further, "Rule 9(b) must be read in conjunction with Rule 8(a) [of the Federal Rules of Civil Procedure], which requires a plaintiff to plead only a short, plain statement of the grounds upon which he is entitled to relief." Brooks v. Blue Cross and Blue Shield of Florida, Inc., 116 F.3d 1364, 1371 (11th Cir. 1997) (citing O'Brien v. National Property Analysts Partners, 719 F. Supp. 222, 225 (S.D.N.Y. 1989)).

"Rule 9(b) is satisfied if the complaint sets forth '(1) precisely what statements were made in what documents or oral representations or what omissions were made, and (2) the time and place of each such statement and the person responsible for making (or, in the case of omissions, not making) same, and (3) the content of such statements and the manner in which they misled the plaintiff, and (4) what the defendants obtained as a consequence of the fraud.'" Ziemba, 256 F.3d at 1202 (citing Brooks, 116 F.3d at 1371).

Most of Plaintiffs' allegations of misrepresentations and omissions in the Second Amended Complaint do not satisfy the particularity requirement of Rule 9(b). Many allegations do not satisfy the particularity requirement because those allegations lump multiple defendants together. "Rule 9(b) does not allow a complaint to merely 'lump' multiple defendants together but 'require[s] plaintiffs to differentiate their allegations when suing more than one defendant . . . and inform each defendant separately of the allegations surrounding his alleged participation in the fraud.'" Bruhl v. Price Waterhouse Coopers Intern., No. 03-23044-Civ, 2007 WL 997362, *3

10

(S.D. Fla. March 27, 2007) (citing Haskin v. R.J. Reynolds Tobacco Co., 995 F. Supp. 1437,
1439 (M.D. Fla. 1998)).  Throughout the Second Amended Complaint, Plaintiffs refer to
Defendants collectively as the "Financial Institution Defendants," refer to more than one
Defendant, or combine Defendants with PFA when alleging a fraud, rather than identifying
specific misrepresentations, omissions, or actions and stating clearly how they are attributable, on
which occasions or in which documents, to specific individual Defendants.  2nd Amend. Compl.
¶¶ 13, 17, 20–25, 31–48.  Such allegations are insufficient to state a claim under §10(b) and Rule
10b-5.

Also, a plaintiff's use of the passive voice in alleging a fraud can impermissibly obscure
allegations such that the allegations fail to satisfy the particularity requirements of Rule 9(b).
Strategic Income Fund, L.L.C. v. Spear, Leeds & Kellogg Corp., 305 F.3d 1293, 1297 (11th Cir.
2002); Pension Committee of University of Montreal Pension Plan v. Banc of America
Securities, L.L.C., 446 F. Supp. 2d 163, 186 n.153 (S.D.N.Y. 2006) ("Plaintiffs must allege the
speaker of a misrepresentation with particularity and may not obscure pleading deficiencies by
casting allegations in the passive voice."); In re Keithley Instruments, Inc. Securities Litigation,
268 F. Supp. 2d 887, 898 (N.D. Ohio 2002).  Plaintiffs' repeated use of the passive voice when
describing misrepresentations or fraudulent acts obscures exactly who made the statements or
committed the fraudulent acts.  In many instances, it appears that the representations or
fraudulent acts are properly attributable to PFA but, by using the passive voice (e.g., stating that
misrepresentations "were made" to investors), Plaintiffs attempt to broaden responsibility and
make it appear that each Defendant is responsible for each of PFA's and/or another Defendants'
statements, misrepresentations, and fraudulent acts or omissions.  See e.g. 2nd Amend. Compl. ¶

11

24 (Plaintiffs "were assured"), ¶ 27 ("investors were promised"), ¶ 28 ("were promised"), ¶ 32 ("marketing materials were used"), ¶ 55 ("investors were told"), ¶ 57 ("were marketed"), ¶ 60 ("Agreements were entered into"). Similarly, in other instances, Plaintiffs allege that marketing materials or documents made the representations, which also obscures who was responsible for a given representation, because Plaintiffs do not identify specific wording or indicate to whom the statement was attributable. *See e.g.* 2nd Amend. Compl. ¶¶ 24, 25, 26, 27, 28, 29, 33.

Other allegations in the Second Amended Complaint do not satisfy the particularity requirement of Rule 9(b) because Plaintiffs do not point to particular statements or wording in specifically identified documents. Rather than naming specific documents or marketing materials containing misleading information, Plaintiffs often refer only generally to "solicitation," "marketing," "offering," and/or "promotional" materials. *See e.g.* 2nd Amend. Compl. ¶¶ 24, 25, 27–33, 46, 83–85, 91, 97, 98, 117–119, 129. In some instances, Plaintiffs state only that representations "were made" or that something was done contrary to representations made, but do not identify any source at all for those representations. *See e.g.* 2nd Amend. Compl. ¶¶ 35, 36, 37, 43, 63, 102, 103, 109, 121.

Most of the allegations about promised safeguards and safe-handling do not satisfy the particularity requirements of Rule 9(b). For example, Plaintiffs allege that "PFA international, Inc., Claren, TPA, and their principals Cornide and de la Riva, PFA and the Financial Institution Defendants . . . tout[ed] the safety of investing through them with the Financial Institution Defendants serving as trustee, custodians, and fiduciaries of investor funds." 2nd. Amend Compl. ¶ 21. However, this statement does not indicate exactly what was said, how what was said "tout[ed] the safety of investing," when and where it was said, or who in the list actually

made the statement. This is also true of several other similar allegations that Defendants promised to "insure" the safety or "safe-handling" of investment money. *See* Id. at ¶¶ 23, 24, 31, 33, 49, 54, 70. For example, Plaintiffs allege that they "were assured" that Defendants "would insure that the explicit protections . . . were fulfilled by PFA." Id. at ¶24. However, Plaintiffs do not state exactly what "explicit protections" were promised, or in what way Defendants promised to "insure" that PFA acted in a specific manner. Plaintiffs were required to more specifically allege what was said, how it misled Plaintiffs, and what specific safety measures were promised; therefore, these allegations do not satisfy the particularity requirement.

One rare allegation that quotes specific wording of an assurance of safety states only, "[i]n related offering and promotional materials, investors were promised that 'if you invest with Pension Fund of America you will have the peace of mind of knowing that your money is invested in companies like Lehman Brothers . . . which enjoy great liquidity, stability and extensive experience since 1869, and is recognized as one of the major financial institutions in the United States.'" Id. at ¶ 27. First, no specific document is mentioned. Second, Plaintiffs passively allege that investors "were promised" certain things without identifying the party responsible for the statement, and the statement actually appears to have been made by PFA itself. Third, the misrepresentation is that investors would have "peace of mind." General flowery advertising language, such as this assurance of "peace of mind," is not generally actionable as a securities fraud. *See* In re Ford Motor Co. Securities Litigation, 381 F.3d 563, 570–71 (6th Cir. 2004).

Plaintiffs do allege that Defendants promised to safeguard Plaintiffs' investments by segregating accounts, but these allegations also fail to satisfy the particularity requirement.

13

Plaintiffs allege that Defendants promised to segregate investors' funds into separate accounts, but that Defendants fraudulently commingled investor funds into accounts in PFA's name, which facilitated PFA's siphoning of Plaintiffs' money for the personal use of PFA insiders. 2nd Amend. Compl. ¶¶ 35, 37, 55, 85, 102, 109, 114, 127–129. However, Plaintiffs never quote any specific language making this promise to segregate funds, nor do Plaintiffs identify a specific document containing this promise. In one allegation, Plaintiffs quote a SunTrust internal memorandum that "questioned whether the Trust Agreements signed by the individual PFA investors should disclose the fact that investor funds were being deposited in an account controlled and titled in PFA's name." Id. at ¶ 61. However, this statement does not show that the Trust Agreements promised that accounts would be segregated; to the contrary, it implies that the Trust Agreements were silent on the matter and that SunTrust considered whether the Trust Agreements should speak to the matter. In another instance, Plaintiffs allege that "PFA represented to investors that their investments were to be made 'directly with RAYMOND JAMES,'" and use this statement to imply the alleged promise that accounts would be segregated. Id. at ¶¶ 127–128. This is the closest that the allegations come to showing a promise of separate accounts, but the statement is not necessarily a promise that funds would be segregated. Further, this allegation directly attributes the representation to PFA, not Defendants. The Court holds that these allegations are insufficient to show Defendants had a duty to correct any statement attributable to Defendants regarding the segregation of funds.

Further, Plaintiffs do not clearly allege "what Defendants obtained *as a consequence* of the fraud." *See* Ziemba, 256 F.3d at 1202 (emphasis added). Plaintiffs do not allege that Defendants made any withdrawals from the accounts for personal purposes or otherwise

misappropriated Plaintiffs' money.  Plaintiffs do not allege that Defendants allowed any withdrawals other than those made by PFA, whose name was listed on the accounts.  Rather, the major fraud described is the misuse and misappropriation, by PFA, of Plaintiffs' money, including the large unauthorized withdrawals that PFA made for improper purposes.  However, Plaintiffs do not allege that Defendants profited as a result of the mishandling or misappropriation of Plaintiffs' money committed by PFA or its directors.  Plaintiffs do not allege that Defendants have in their possession, or have used, any of the money missing from Plaintiffs' accounts; rather, Plaintiffs allege that PFA and its insiders (not Defendants), "were siphoning as much as 90 percent, and sometimes 100 percent, of investor funds for non-investment purposes," and that "PFA's principals, Cornide and de la Riva, used investors' funds to pay themselves exorbitant salaries and bonuses, and buy millions of dollars of real estate in Coral Gables and the Florida Keys."  2nd Amend. Compl. ¶ 37.  Plaintiffs do allege that Defendants profited from the fees they received from opening accounts with investors' money, but Defendants receive fees from investment accounts as a general business matter, so fees received in connection with PFA accounts were not necessarily received as a result of fraud.

### 3.    Post-Investment Fraud, Misrepresentations and Omissions

"[T]o be primarily liable under §10(b) and Rule 10b-5, the alleged misstatement or omission upon which a plaintiff relied must have been publicly attributable to the defendant *at the time that the plaintiff's investment decision was made*."  Instituto de Prevision Militar v. Merrill Lynch & Co., Inc., Case No. 05-22721-Civ, 2007 WL 2900318, *5 (S.D. Fla. Sept. 28, 2007) (citing Ziemba, 256 F.3d at 1205).  Defendants argue that many of the alleged omissions and misrepresentations are not actionable because they occurred after the investors' investment

15

decision was made. Plaintiffs counter that the allegations that 85 percent of investors chose the Liberty Trust which required "monthly or annual contribution[s] . . . of between $1,000 and $20,000 for ten to fifteen years shows that even if these omissions occurred after the initial investment, investors who selected the Liberty Trust continued to make investments monthly or annually after opening an account. Pl. Resp. at 18, n.10. Resolution of this issue depends on whether the decision to invest in a Liberty Trust was a one-time investment decision, or whether a new investment decision was made each month or year when the subsequent contribution was due.

The Court holds that the Liberty Trust was a one-time investment. This Court has held that the Liberty Trust is itself a covered security under the Securities Litigation Uniform Standards Act. *See* Cordova v. Lehman Bros., Inc., 413 F. Supp. 2d 1309 (S.D. Fla. 2006). The investors who selected the Liberty Trust made a decision to invest in the Liberty Trust at the time they first signed a contract. When first selecting the Liberty Trust, the investors agreed to contribute a set amount of money each period for a given number of years. The investors were obligated to make those contributions each period, or suffer a severe cancellation penalty. The investors decided to invest in this covered security and agreed to the continuing obligation at the time of initial selection and signing of the contract. Therefore, the Court holds that the Liberty Trust was a one-time investment which occurred at the time of initial selection of the Liberty Trust. Accordingly, the Court holds that the omissions specifically argued in Plaintiffs' Responses (*see* Section II "Plaintiffs have adequately pled that Defendant[s] violated the federal securities laws"), together with many of the other alleged omissions and misrepresentations in the Second Amended Complaint, are not actionable because they occurred after the time of the

16

investment decision.[2] *See* <u>Instituto de Prevision Militar</u>, 2007 WL 2900318, at \*5 (citing

Ziemba, 256 F.3d at 1205).

### 4.    Fraudulent Omissions

In their Responses to the Motions to Dismiss, Plaintiffs withdraw from focusing on the

misrepresentations alleged in the Second Amended Complaint and assert that "Defendants are

alleged to have committed fraud primarily by omission," and "this case is primarily based on the

Defendants' omissions." Pl. Resp. at 14, 15.  In the argument section of their Responses,

Plaintiffs focus their discussion of Defendants' fraud on attempting to establish that Defendants

had a duty to disclose material information and on Defendants' alleged omissions.  Pl. Resp. at

13–18.  Plaintiffs appear to recognize that the primary misconduct was on the part of PFA and its

insiders, but argue that Defendants joined the fraud and became primarily liable when they

allowed their names to be used to lend credibility to PFA and then failed to make important

disclosures which might have prevented PFA's mishandling and misappropriation of investors'

money.  The Court will focus primarily on analyzing the alleged omissions Plaintiffs raised and

argued in their Responses.

In the section of the Responses where Plaintiffs argue that "Plaintiffs have adequately

pled that Defendant[s] violated the federal securities laws," Plaintiffs identify four basic alleged

omissions: (1) that Defendants "omitted to inform" Plaintiffs that Defendants were failing to

fulfill their duties as trustees/fiduciaries to "safeguard Plaintiffs' funds;" (2) that Defendants

"omitted to inform Plaintiffs about the pooling of their funds" or their failure to provide

"segregated trust accounts;" (3) that Defendants did not inform Plaintiffs that Defendants had

---

[2]It is interesting to note that Plaintiffs' First Amended Complaint (dkt # 38) describes most of
Defendants' alleged misconduct as "post-investment."

"allowed PFA to exert complete control over [Plaintiffs' funds];" and (4) that Defendants "omitted to inform Plaintiffs about . . . the fact that PFA insiders were siphoning off the bulk of investor funds for non-investment purposes." Pl. Resp. at 17.

However, "a defendant's omission to state a material fact is proscribed only when the defendant has a duty to disclose." Ziemba, 256 F.3d at 1206 (citing Rudolph, 800 F.2d at 1043). The Eleventh Circuit has recognized that a duty to disclose arises under two circumstances: (1) "[w]here a defendant's failure to speak would render the defendant's own prior speech misleading or deceptive;" and (2) "where the law imposes special obligations, as for accountants, brokers, or other experts, depending on the circumstances of the case." Id. Factors to be considered in determining whether a duty to disclose exists include: "the relationship between the plaintiff and defendant, the parties' relative access to the information to be disclosed, the benefit derived by the defendant from the purchase or sale, defendant's awareness of plaintiff's reliance on defendant in making its investment decision, . . . defendant's role in initiating the purchase or sale[,] . . . the extent of the defendant's knowledge and the significance of the misstatement, fraud or omission, [and] . . . [t]he extent of the defendant's participation in the fraud." Id.

Plaintiffs' argument that Defendants had a duty to Plaintiffs is weakened by the fact that, with the exception of SunTrust,[3] Plaintiffs and Defendants did not have formal relationships. Accounts opened with Defendants were in PFA's name, not those of individual investors. Defendants did not receive a special or unusual benefit from the opening of an investment. For the most part, PFA, not Defendants, directly solicited investments and spoke with investors. From the allegations, it appears that PFA and its principals were the primary creators and

---

[3]SunTrust is an exception because it signed contracts with individual investors and directly sent account statements to investors.

perpetrators of the fraud. These factors weigh against finding a duty.

Further, because an omission must have been relied upon "at the time that the plaintiff's investment decision was made," Defendants must have had a duty to disclose the omitted information at the time of the investors' investment decisions. <u>Instituto de Prevision Militar</u>, 2007 WL 2900318, at *5 (citing Ziemba, 256 F.3d at 1205). Even if Defendants did not disclose that they were failing to act as trustees, failed to provide promised safeguards, failed to segregate accounts, allowed PFA to exert complete control over accounts, and/or allowed PFA to siphon Plaintiffs' money, their failures are not actionable under §10(b) and Rule 10b-5 because they occurred post-investment, and any duty to disclose these failures likewise would not have arisen until after the investment decision.

Plaintiffs also argue that Defendants had a duty to disclose because they allowed PFA to use Defendants' corporate names, logos, and corporate reputations in PFA's marketing materials. 2nd Amend. Compl. ¶¶ 39, 58, 78, 83, 97, 119, 124. Plaintiffs cite <u>Rudolph v. Arthur Andersen & Co.</u>, which states, "[s]tanding idly by while knowing one's good name is being used to perpetrate a fraud is inherently misleading." 800 F.2d 1040 (11th Cir. 1986). However, <u>Rudolph</u> predates <u>Central Bank</u> and did not distinguish precisely between primary liability and aiding and abetting liability. <u>Shapiro v. Cantor</u>, 123 F.3d 717, 721 n.2 (2nd Cir. 1997). More importantly, <u>Rudolph</u> is distinguishable because it deals with liability of accountants, not business partners. In <u>Rudolph</u>, the Eleventh Circuit emphasized that accountants have a duty to independently evaluate a company and, when they offer an opinion or certify financial statements, they undertake "a special relationship of trust vis-a-vis the public" and hold themselves out as "an independent professional source of assurance." <u>Rudolph</u>, 800 F.2d at 1044. Companies and people in

19

business with each other to jointly market a product, on the other hand, do not have this "special relationship of trust" to the public. Companies in a joint venture do not independently evaluate and certify to the public the quality of the business practices and financial statements of each business partner; neither do they hold themselves out to the public as being independent or disinterested. *See* Instituto de Prevision Militar, 2007 WL 2900318, at *5.

Alternatively, Plaintiffs argue that Defendants owed a fiduciary duty to Plaintiffs to disclose each of the alleged omissions. Pl. Resp. at 15–16; 2nd Amend. Compl. ¶¶ 17–21. "[F]or a confidential or fiduciary relationship to exist under Florida law, there must be substantial evidence showing some dependency by one party and some undertaking by the other party to advise, counsel, and protect the weaker party." Lanz v. Resolution Trust Corp., 764 F. Supp. 176, 179 (S.D. Fla. 1991). Plaintiffs' allegations do not show such a special relationship or that Defendants undertook to advise, counsel, or protect investors.

All factors considered, the Court concludes that Plaintiffs' allegations are insufficient to show Defendants had a duty to disclose, and are insufficient to state a private cause of action under §10(b) and Rule 10b-5 for primary liability against Defendants.

### 5.    Strong Inference of Scienter

To establish liability under §10(b) and Rule 10b-5, a private plaintiff must prove that the defendant acted with scienter, "a mental state embracing intent to deceive, manipulate, or defraud." Ernst & Ernst v. Hotchfelder, 425 U.S. 185, 193 n.12 (1976). A showing of severe recklessness can satisfy the scienter requirement. Ziemba, 256 F.3d at 1202 (citing McDonald v. Alan Bush Brokerage Co., 863 F.2d 809, 814 (11th Cir. 1989)). However, "[s]evere recklessness is limited to those highly unreasonable omissions or misrepresentations that involve not merely

20

simple or even inexcusable negligence, but an extreme departure from the standards of ordinary care, and that present a danger of misleading buyers or sellers which is either known to the defendant or is so obvious that the defendant must have been aware of it." Id.

To survive a motion to dismiss, a plaintiff must "state with particularity facts giving rise to a *strong inference* that the defendant acted with the required state of mind." 15 U.S.C. §78u-4(b)(2) (emphasis added); Tellabs, 127 S. Ct. at 2504. To qualify as a "strong inference" within the meaning of the statute, "an inference of scienter must be more that merely plausible or reasonable—it must be cogent and at least as compelling as any opposing inference of nonfraudulent intent." Tellabs, 127 S. Ct. at 2504–05. "[T]o determine whether a complaint's scienter allegations can survive threshold inspection for sufficiency, a court . . . must engage in a comparative evaluation; it must consider, not only inferences urged by the plaintiff, . . . but also competing inferences rationally drawn from the facts alleged." Tellabs, 127 S. Ct. at 2504.

Plaintiffs' factual allegations do not support an inference that Defendants acted with an intent to defraud investors, but Plaintiffs' allegations that Defendants had the requisite scienter because they were severely reckless under the circumstances are somewhat stronger. Plaintiffs allege several improper practices used by PFA, and claim that Defendants should have been aware of these improper practices based on lawsuits brought against PFA. Plaintiffs allege unusual account activity for a pension fund account. Further, Plaintiffs point to documents or emails of Defendants containing information and/or discussions about PFA.

However, severe recklessness must "approximate actual intent to aid in the fraud" and "must be shown to such an extent that a reasonable finder of fact could actually infer fraudulent intent from it." Chill v. General Elec. Co., 101 F.3d 263, 269 (2nd Cir. 1996) (citations omitted);

21

*see also* <u>Ziemba</u>, 256 F.3d at 1202 (simple and inexcusable neglect are not sufficient to show scienter; rather, there must be an "extreme departure from the standards of ordinary care."). The alleged red flags, unusual account activity in pension fund accounts, improper practices, knowledge of lawsuits, and awareness that PFA was using Defendants' names in marketing materials would probably support a showing of negligence or even inexcusable negligence on the part of Defendants, but is not strong enough to show that Defendants acted in so severely reckless a manner that a reasonable finder of fact could infer that Defendants intended for investors to be defrauded.

As an alternative, the facts alleged could show merely that Defendants had a business relationship with PFA, not that Defendants intentionally or with severe recklessness involved themselves in PFA's fraud. The Court finds that it would be reasonable to infer that PFA also misled Defendants, and that Defendants might have had a business relationship without knowing of PFA's fraud.

For the most part, PFA was the account holder listed on the accounts with Defendants, and it was not unusual, let alone severely reckless, for Defendants to allow an account holder to withdraw funds. Defendants are not required to carefully scrutinize an account holder's every action and question the account holder's motives. Allegations that Defendants should have been more suspicious of the account activity in a pension fund account might support a showing of negligence, but not a showing of severe recklessness.

The Court holds that inferences, from the factual allegations, that Defendants did not intentionally or by severe recklessness violate §10(b) and Rule 10b-5 are at least slightly more

22

compelling than the inferences suggested by Plaintiffs.[4]

### 6.    Fraud on the Market

Plaintiffs raise the "fraud on the market" theory. Under the "fraud on the market" theory, "[w]hen the fraud alleged is so pervasive that absent the fraud the bonds could not have been marketed, the reliance element is established by the buyer's reliance on the integrity of the market." Ross v. Bank South, N.A., 885 F.2d 723, 729 (11th Cir. 1989). However, a plaintiff must show that the securities "could not have been offered on the market at any price absent the fraudulent scheme." Id. (citation and quotations omitted). The Court finds that Plaintiff has not made allegations sufficient to make this showing.

### 7.    Loss Causation

To survive a motion to dismiss, "something beyond the mere possibility of loss causation must be alleged." Twombly, 127 S. Ct. at 1966 (citing Dura Pharmaceuticals, Inc. v. Broudo, 544 U.S. 336 (2005)). To establish loss causation, "a plaintiff must show 'that the untruth was in some reasonably direct, or proximate, way responsible for his loss.'" Robbins v. Koger Properties, Inc., 116 F.3d 1441, 1447 (11th Cir. 1997) (citing Huddleston v. Herman & MacLean, 640 F.2d 534, 549 (5th Cir. 1981), aff'd in part, rev'd in part on other grounds, 459 U.S. 375

---

[4] It is interesting to note that the SEC investigated the underlying facts of the PFA fraud and did not include Defendants as parties in the litigation against PFA and its principals. SEC v. Pension Fund of America, Case No. 05-20863-CIV-MOORE/GARBER. In the Complaint in that action, the SEC asserted that PFA had "misrepresented their relationships with major financial institutions and broker-dealers, falsely holding the institutions out as trustees or custodians for investors' funds." Id. at Compl. ¶ 2. The SEC further asserted that PFA's representations that the financial institutions were trustees or custodians were false and that, "[n]one of the financial insitutions has ever served as a trustee or custodian for investors." Id. at Compl. ¶¶ 31–32. The SEC asserted that PFA forged investment certificates with counterfeit seals to perpetuate their lies about relationships with financial institutions, and that "none of the financial institutions authorized [PFA] . . . to use their trademarks." Id. at Compl. ¶ 33. However, the SEC did later bring an individual action against HSBC Bank USA, N.A. for its role in the PFA fraud. SEC v. HSBC Bank USA, N.A., case no. 07-22469-CIV-SEITZ. To date, the SEC has not brought an action against any of the financial institutions remaining as defendants in this case.

(1983)).  "If the investment decision is induced by misstatements or omissions that are material and that were relied on by the claimant, but are not the proximate reason for his pecuniary loss, recovery under the Rule is not permitted."  Id.  In other words, a plaintiff must show that "the misrepresentation touches upon the reasons for the investment's decline in value."  Id.

Plaintiffs allege that "[a]s a direct and proximate result of the conduct alleged herein, Plaintiffs have suffered damages in connection with their investments with PFA."  2nd Amend. Compl. ¶ 186.  Plaintiffs argue that this allegation is sufficient to allege loss causation and survive a motion to dismiss.  Pl. Resp. (Raymond James & OIG) at 19–22.  Pl. Resp. (SunTrust) at 24–26.  Plaintiff argues that "precision is unnecessary at [the motion to dismiss] stage."  Id. (citing Whitbread (US) Holdings, Inc. v. Baron Philippe de Rothschild, S.A., 630 F. Supp. 972, 978–79 (S.D.N.Y. 1986)).  However, the Supreme Court, in Bell Atlantic Corp. v. Twombly, held that, to survive a motion to dismiss, allegations are required to be "more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." Twombly, 127 S. Ct. at 1964–65.  The Court finds Plaintiffs' conclusory statement that its damages were proximately caused by Defendants' actions and omissions is insufficient.  Further, allegations in the Second Amended Complaint show that the direct cause of the decline in value of the investments was the misappropriation of investor funds by PFA and its insiders, not any misrepresentation or omission of Defendants.  Accordingly, the Court holds that Plaintiffs have not adequately pled loss causation.

### 8. SunTrust Bank

The allegations against SunTrust bank are stronger than against any of the other Defendants and warrant separate discussion.  First, some of the allegations against SunTrust are

more particular and more clearly attributable to SunTrust than is the case with allegations against the other Defendants. Plaintiffs allege that SunTrust knew about, but did not disclose, the large fees that SunTrust and PFA charged investors. SunTrust shared fees with PFA on a 50/50 basis, and SunTrust's lawyers advised SunTrust's Vice President that some fees were "steep," yet Suntrust did not disclose all the fees that would be charged to investors or the "fee kickback" to SunTrust of 50 percent of the fees. 2nd Amend. Compl. ¶¶ 53, 62, 64. Plaintiffs allege that "PFA and SunTrust jointly marketed their relationship to investors and described the role of SunTrust as a 'trustee for all participants of [PFA]'s pension plans.'" Id. at ¶ 26. Plaintiffs quote an internal memorandum dated September 10, 1999, in which Ary Velasco, Vice President of SunTrust, acknowledged that PFA would be telling investors that SunTrust would "act as Trustee for the individual non-resident Latin American clients" of PFA. Id. at ¶ 51.

Most significantly, Plaintiffs allege that Ary Velasco, on or around May 1, 2000, authored a letter of recommendation to be distributed to investors, addressed "[t]o whom it may concern," which represents to investors that SunTrust would act "as Trustee for the Personal Retirement Trust and the Educational Trust" and that Suntrust was "honored to be trustee for [their] personal retirement and/or educational trusts." Id. at ¶¶ 66, 67. Of the allegations in the Second Amended Complaint, this is perhaps the most particular and most persuasive, and it is unparalleled by the allegations against the other Defendants. The letter of recommendation is a unique allegation that identifies specific wording in a clearly identified document, in which the statements are directly attributable to a high-ranking SunTrust officer, and it appears that SunTrust intended potential investors to receive and rely on the statements. This allegation was pled with particularity, and the statement that SunTrust would act as trustee for the PFA trust funds was publically

attributable to SunTrust.

Further, SunTrust was aware that its duties as trustee, as listed in its contract with PFA (the "Master Custodial Agreement"), were inconsistent with duties listed in the individual Trust Agreements which SunTrust entered into directly with investors. Id. at ¶ 60. SunTrust is the only Defendant that admittedly signed trust agreements directly with investors, and thereby had a direct formal relationship with investors. Further demonstrating this relationship, SunTrust issued numerous certificates and account statements directly to investors, signed by SunTrust bank officer Odalys del Oso. Id. at ¶¶ 39, 47, 65. These allegations, taken as true, show that SunTrust represented to investors that it would be a trustee and did not correct inconsistencies regarding its duties and role in contracts signed with investors. Each of these factors gives stronger support for finding that SunTrust had a duty to disclose than existed in allegations against the other Defendants.

The argument that the factual allegations show SunTrust was severely reckless, thereby satisfying the scienter requirement, is also stronger. Plaintiffs allege that SunTrust sent account statements to individual investors and knowingly misrepresented the balances in the accounts and concealed that up to 90 percent of investors' principal investments had been removed. Id. at ¶¶ 39, 47, 65. Plaintiffs further allege that SunTrust was more intimately involved in the establishment of PFA than other Defendants; that a 1999 SunTrust internal memorandum showed SunTrust was aware that PFA would tell investors that SunTrust would act as trustee; that SunTrust did not disclose its fee sharing; that SunTrust did not ensure that insurance policies were purchased; that SunTrust received a fax which promised Liberty Plan Participants not less than 30 percent of their first year contribution would go their designated mutual funds, yet

26

SunTrust contemporaneously received deposit instructions from PFA which indicated that PFA was diverting 80 percent or more of the incoming funds; that a 1999 SunTrust memorandum recognized that the Master Custodial Agreement with PFA and individual Trust Agreements with investors were inconsistent and questioned whether the Trust Agreements should tell investors that funds were being deposited in an account controlled and titled in PFA's name; and that SunTrust's lawyers expressed concerns about the magnitude of the "up front penalty on revocation." Pl. Resp. at 18–23.

One of the strongest factual allegations to support a finding of severe recklessness is a September 14, 1999 SunTrust Trust Department memo which advised Vice President Velasco that the relationship proposed to be offered by SunTrust and PFA needed to be reviewed by the Bank's Fiduciary Oversight Committee to address "banking/insurance/fiduciary questions," but the compliance and relationship review was never secured. 2nd Amend. Compl. ¶ 52. Considering allegations that SunTrust directly represented to investors (in the letter of recommendation authored by SunTrust) that it would act as trustee, and its recognition of inconsistencies in the contracts with investors, the case is stronger that a reasonable fact finder could conclude SunTrust had acted recklessly in not having its fiduciary oversight committee review the relationship and duties it offered to potential investors after being warned such review was necessary.

Even though the Court recognizes that the allegations against SunTrust are more likely to support a finding of violations of §10(b) and Rule 10b-5 than the allegations against the other Defendants, the Court holds, as discussed below, that recovery is barred against all Defendants, including SunTrust, based on statute of limitations grounds.

27

### 9. Statute of Limitations

Following the enactment of the Sarbanes-Oxley Act, §10(b) claims must be brought at the "earlier of . . . two years after discovery of the facts constituting the violation; or five years after such violation." 28 U.S.C. §1658(b); Tello v. Dean Witter Reynolds, Inc., 410 F.3d 1275, 1279 (11th Cir. 2005) ("limitation dates necessarily create a closed class of cases eligible to be filed within two years of the discovery of the securities fraud"). However, "[f]ull revelation of a securities fraud is not required[,] . . . only notice of the *possibility of fraud*, which signals the need for the class representative to commence sufficient investigation to file a complaint." Tello v. Dean Witter Reynolds, Inc., 494 F.3d 956, 970 (11th Cir. 2007) (emphasis in original). Where "actual knowledge" of the fraud is absent, "inquiry notice" is sufficient to begin the limitations period. Id. at 970–71.

"Inquiry notice is the term used for knowledge of facts that would lead a reasonable person to begin investigating the possibility that his legal rights had been infringed. . . . [I]nquiry notice is triggered by evidence of the possibility of fraud." Tello, 410 F.3d at 1283. However, "[w]hether a plaintiff had sufficient facts to place him on inquiry notice of a claim for securities fraud . . . is a question of fact, and as such is often inappropriate for resolution on a motion to dismiss under Rule 12(b)(6)." La Grata v. First Union Securities, Inc., 358 F.3d 840 (11th Cir. 2004) (citing Marks v. CAW Computer Centers, Inc., 122 F.3d 363, 367 (7th Cir. 1997) (reversing district court's Rule 12(b)(6) dismissal)). In this case, Defendants allege that, on the face of the Complaint, Plaintiffs were so clearly on notice that dismissal based on statute of limitations grounds is warranted.

Compliance with the statute of limitations period is gauged based on the class

28

representatives' knowledge of the securities law violation or knowledge of facts showing the possibility of fraud. Tello, 494 F.3d at 970. The Second Amended Complaint states that on February 28, 2003, a group of fourteen individual investors, including one of the plaintiffs named as a class representative in this suit, Marcos Mustieles, brought a public lawsuit against PFA, SunTrust, and Lehman Bros. alleging that the trustee banks had breached their fiduciary duties, had resigned without notifying investors, and that money had been improperly transferred from bank accounts to PFA. Id. ¶¶ 93, 133, 162; see also SunTrust Mot. at 13. The fact that Marcos Mustieles brought an earlier lawsuit against two of the Defendant banks in this case, alleging that the banks were acting improperly with regard to his investments, shows he "discovered the facts constituting" the underlying fraudulent scheme and was on actual notice that his legal rights might have been infringed. Since Marcos Mustieles and thirteen other investors were on actual notice of the fraudulent scheme and that financial institutions were involved by February 28, 2003, they must have been on inquiry notice at some time prior to that date.

The Court holds that where notice can be shown from the pleadings in an earlier case, filed by a class representative, notice is established as a matter of law and no further discovery or fact finding is necessary. Further, once a party is on notice of a fraudulent scheme, that notice encompasses inquiry into the scope of the scheme and the role of parties whose actions may have contributed to the functioning of the scheme. Therefore, Plaintiffs in this case were on notice of Defendants' alleged fraud as early as February 28, 2003.[5] Because Plaintiffs brought this lawsuit

_____

[5]The Court notes that after Defendants moved to dismiss this action and raised the fact that one of the named plaintiffs had brought suit more than two years earlier against PFA, SunTrust, and Lehman Bros., Plaintiffs moved for leave to file a Third Amended Complaint (dkt # 241, 242) removing Marcos Mustieles as a named plaintiff. On August 18, 2006, the Court issued an Order (dkt # 273) denying Plaintiffs' request for leave to file the Third Amended Complaint. Even if the Court had allowed the class to remove Marcos Mustieles as a class representative, the Court would nonetheless conclude that investors were on inquiry notice more than two years prior to bringing this lawsuit. Tello, 494 F.3d at 971 ("Inquiry

on April 28, 2005, more than two years later, the lawsuit is barred by the statute of limitations. Accordingly, dismissal of this case based on statute of limitations grounds is warranted.

### B.     Sections 12(1) and 15 of the 1933 Securities Act

Count I of the Second Amended Complaint alleges Defendants violated §12(1) and §15 of the 1933 Securities Act. In their Responses, Plaintiffs concede that Count I "must be dismissed because [Defendants] cannot be legally held to have violated these provisions." Pl. Resp. at 2, n.1. Accordingly, Count I shall be dismissed against all Defendants.

## IV.   <u>CONCLUSION</u>

While Plaintiffs have alleged and may be able to show some misconduct and negligence by Defendants, generally these allegations indicate that Defendants aided and abetted PFA's securities fraud, not that Defendants are primarily liable for violations of §10(b) and Rule 10b-5 in a private cause of action.

Based on the foregoing, it is

ORDERED AND ADJUDGED that Defendant Raymond James Financial Services, Inc.'s Motion to Dismiss (dkt # 217) is GRANTED. It is further

ORDERED AND ADJUDGED that Defendant SunTrust Bank, Inc.'s Motion to Dismiss

---

notice in [the Eleventh] circuit as to securities fraud occurs when a potential plaintiff discovers facts evidencing securities fraud" and changing the class representative "is irrelevant.") (citation omitted).

Further, "[w]ith the advent of the 'information superhighway,' information regarding securities is 'easily accessed' and '[a] reasonable investor is presumed to have information available in the public domain.'" <u>Tello</u>, 494 F.3d at 970. On November 26, 2002, Instituto de Prevision Militar ("IPM"), a quasi-governmental agency of Guatemala that manages pension funds for members of the Guatemalan Armed Forces and one of the largest investors in PFA' retirement trusts, brought a public lawsuit against PFA asserting claims against PFA for conversion, unjust enrichment, temporary injunction, constructive trust, breach of contract, fraud, breach of fiduciary duty, fraud in the inducement, and civil conspiracy. Id. ¶¶ 92, 111, 132, 162. Additionally, SunTrust brought a public lawsuit in 2001 against PFA. 2nd Amend. Compl. ¶¶ 71–73, 131, 162. These lawsuits, together with the one brought by the fourteen investors give sufficient support for finding that investors were on notice of the fraud more than two years prior to filing this lawsuit.

(dkt # 218) is GRANTED.  It is further

     ORDERED AND ADJUDGED that Defendant Merrill Lynch & Co., Inc.'s Motion to

Dismiss (dkt # 220) is GRANTED.  It is further

     ORDERED AND ADJUDGED that Defendant Lehman Brothers, Inc.'s Motion to

Dismiss (dkt # 221) is GRANTED.  It is further

     ORDERED AND ADJUDGED that Defendant Oliva Investment Group, Inc.'s Motion to

Dismiss (dkt # 226) is GRANTED.  The Second Amended Complaint is hereby DISMISSED

WITH PREJUDICE.  The Clerk of Court is instructed to CLOSE this case.  All pending motions

are DENIED AS MOOT.

     DONE AND ORDERED in Chambers at Miami, Florida, this 7th day of December,

2007.


K. MICHAEL MOORE
UNITED STATES DISTRICT JUDGE

cc:    All counsel of record

31